UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
      v.                           )      No. 4:08 CR 189 RWS
                                   )                       DDN
ANDREW J. WARREN,                  )
                                   )
            Defendant.             )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on June 6, 2008.

Defendant Andrew Warren has moved to suppress evidence and statements. (Oral motion 11, Docs. 20, 21.) From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

Search warrant

1. On July 16, 2007, St. Louis County Police Sergeant Adam Kavanaugh, who directs the Special Investigation Unit, used a file-sharing software program, Phex, to search the Internet for computers offering to share child pornography. On the Gnutella internet network Sgt. Kavenaugh found a file, that was offered for sharing, whose digital SHA-1 value was identical to that of a file known to contain child pornography. Sgt. Kavenaugh determined that a computer with an IP address of 70 . . . 167 offered to share this file.[1]

2. Sgt. Kavenaugh informed his supervisor, Detective Michael McCartney, of his findings. In August 2007 Det. McCartney subpoenaed AT&T for information about the subscriber with IP address 70 . . . 167.

---

[1]For the purposes of convenience in the writing of this opinion, the undersigned has abbreviated the subject IP address.

He learned that the IP address subscriber resided at 8923 Arvin Place in Affton, Missouri. Further investigation revealed this was the home of defendant Andrew Warren.

3. On September 11, 2007, Det. McCartney applied to the Circuit Court of St. Louis County for a search warrant for this residence to seize any electronic equipment and related items that related to child pornography. Gov. Ex. 1 at 1-2.

4. In support of his application, Det. McCartney submitted his sworn, written affidavit which stated his reasons for believing that a computer, other digital equipment, and related items containing child pornography were located at 8923 Arvin Pl. in Affton, Missouri. The reasons for this belief were set forth in the affidavit as follows:[2]

a. Det. McCartney's and Sgt. Kavanaugh's extensive experience and training in investigating child pornography using computer and internet technology is set out in paragraphs 1 and 6 of the affidavit, respectively.

b. Paragraph 2 stated that on September 5, 2007, Sgt. Kavanaugh advised the affiant that an undercover investigation on July 16, 2007, determined that a computer in Missouri was "offering to participate in the distribution of known child pornography."

c. Paragraph 3 described how Sgt. Kavanaugh's investigation developed. First, using publicly available peer-to-peer software (Phex), he searched on the Gnutella network[3] using the search term "PTHC," a term commonly linked to child pornography. The search turned up a

---

[2]The information set forth in the affidavit is described with specificity in this opinion, because of the specificity of arguments made by defendant for suppression of the evidence seized in the execution of the search warrant.

[3]Paragraph 8g of the affidavit describes the operation of the Gnutella network system, whereby large numbers of Internet users are grouped and participate in offering to provide or in actually providing all or discrete parts of a digital file that is requested by one user of the network.

list of files, including one with a 32-character alpha-numeric SHA1 designation of "H4V . . .UTI."[4]

d.   Paragraph 4 recounted Sgt. Kavanaugh's statement that he has viewed the movie file that has the SHA1 value H4V . . . UTI and that this file depicts a prepubescent female tied up having oral and anal intercourse with an adult male.   Paragraph 10 stated that "Sgt. Kavanaugh could use the publicly available software to request a list of Internet network computers that are reported to have the same images for trade or are participating in the trade of known images."

---

[4]For convenience, in this opinion the SHA1 value set out in full in the search warrant affidavit will be referred to as "H4V . . . UTI."   The affidavit defined the term "SHA1" (also known as "SHA-1") as being a mathematical algorithm

> that uses the Secure Hash Algorithm (SHA), developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS).   The United States of America has adopted the SHA-1 hash algorithm described herein as a Federal Information SMWg02 Processing Standard.   Basically the SHA1 is an algorithm for computing a condensed representation of a message or data file like a fingerprint.

Gov. Ex. 1 at 5.   The affidavit also stated:

> 7.   . . .   These SHA1 values are gathered by the National Center for Missing and Exploited Children and various nationwide law enforcement agencies to locate computers distributing in part, images believed to be child pornography.   This information is based upon law enforcement being able to identify the ages of children in some of the images as being under 18 and involved in child pornography.

Id. at 4.   The affidavit also stated in paragraph 13 that Det. McCartney knows that, by comparing SHA1 values ("digital signatures"), he can determine that a certain computer, identified by its IP address, has on it "specific and known images of child pornography." Id. at 6.

e.   Paragraph 4 stated that Sgt. Kavanaugh began downloading the H4V .
     . . UTI file and the system program showed a list of IP addresses
     that were then publicly offering to share at least part of the file
     that has the SHA1 H4V . . . UTI value.

f.   Paragraph 5 stated that a computer in St. Louis with an IP address
     of 70 . . . 167 "was contributing to the distribution of child
     pornography.  This affiant knows from experience that the software
     can be configured to allow parts of the file to be shared even if
     the copy located at IP address of 70 . . . 167 has not yet been
     completely downloaded."

g.   Paragraph 9 stated that Sgt. Kavanaugh stated that, from his
     training and experience, he knows that digital files can be
     processed with the SHA-1 value which results in a digital signature.
     "By comparing these signatures, [Sgt. Kavanaugh] can conclude that
     two files are identical with a precision that greatly exceeds 99.9
     percent certainty based on information from the National Institute
     of Standards and Technology."  Id.  Paragraph 14 stated:

          The SHA1 value for a file will remain the same unless it
          has been changed in any way.  Then a different SHA1
          value would be assigned to the file.  Sgt. Kavanaugh
          stated to this affiant that he knows that the above file
          is the same file he previously viewed.

h.   Paragraph 15 stated that "[a]t approximately 1458 hours on July
     16th, 2007 Sgt. Kavanaugh *was able to* download in part, the file
     with a SHA1 value of H4V . . . UTI from a computer using the IP
     address of 70 . . . 167."  Paragraph 17 stated in part, "Affiant
     knows from training and experience that the software can be
     configured to allow parts of the file to be shared even if the copy
     located at IP address of 70 . . . 167 has not yet been completely
     downloaded."  (Italics added.)

I.   Paragraph 16 stated that further investigation indicated that the
     IP address of 70 . . . 167 was assigned to Michael Warren at 8923
     Arvin, St. Louis, Missouri 63123.

j.   Paragraph 23 stated, "On Tuesday September 4th, 2007, this affiant
     viewed the noted file . . . ."

Gov. Ex. 1.

5.    Judge Maura B. McShane reviewed Det. McCartney's affidavit and issued the search warrant for 8923 Arvin at 9:45 a.m. on September 11, 2007.  Gov. Ex. 1 at 9.

6.    On September 12, 2007, St. Louis County police executed the search warrant.  Entry was forced because no one was present when the officers arrived at the residence.  The police located a computer inside 8923 Arvin and seized it.

## Defendant's statements

7.    During the execution of the warrant, Warren drove up to his residence.  He was approached by several officers and asked to step out of his vehicle.  Dets. McCartney and Francis Gomez informed him of the nature and purpose of the investigation, and they told him about the search warrant then being executed.  Det. Gomez told Warren he wanted to interview him and asked him if he would accompany him to the St. Louis County Police Department for that purpose.  Warren agreed to accompany him there and be interviewed.  Warren did not appear to have a mental or physical condition that made an interview inappropriate.  No promise or threat was used to get Warren to cooperate.

8.    The interview took place in an interview room at the St. Louis County Police Department. Det. Gomez audio recorded the interview.  At the beginning of the interview, Det. Gomez read to Warren, then age 28, out loud his constitutional rights to remain silent and to counsel. After each right was stated, Warren wrote his initials next to each statement of a right to indicate he understood his right.  When this was accomplished, Det. Gomez asked Warren whether he understood his rights.

9.    Then, the following discussion occurred:[5]

| Warren: | I am not sure though. |
| Det. Gomez: | What are you not sure of? |
| Warren: | I have the right to a lawyer. |
| Det. Gomez: | Yes, you do. |
| Warren: | To be present at this time. |

---

[5]The following quotations of portions of the interview are from the undersigned's review of the audio record, Government Exhibit 3.

- 5 -

| | | |
|---|---|---|
| Det. Gomez: | Right. And. If . . .[6] You do have the right to a lawyer. That's correct. If you want to exercise those rights, they're your rights. I'm not going . . . at that point the interview will stop. |
| Warren: | What do you mean? |
| Det. Gomez: | If you, if you ask for an attorney, I can't talk to you. In other words, then we can't talk any more. |
| Warren: | OK. |
| Det. Gomez: | So . . . that's. |
| Warren: | What happens then? |
| Det. Gomez: | Then . . . I'm not sure what you're . . . I mean, we're done talking. |
| Warren: | OK. OK. I can refuse to stop. |
| Det. Gomez: | You get it, don't you? You can . . .at any point in the interview . . . . |
| Warren: | Fine. |
| Det. Gomez: | . . . you can stop. |
| Warren: | OK. That's fine. |
| Det. Gomez: | OK? |

(Brief pause. Sounds of handwriting.)

Gov. Ex. 3.

  10. At this time Warren signed his name to the Warning and Waiver form, Government Exhibit 2, immediately following the paragraph expressly waiving his rights. Warren then handwrote the date and time.

  11. The interview continued:

| | | |
|---|---|---|
| Warren: | I'm sorry. I have never done this. |
| Det. Gomez: | OK. No problem. It's 9, 12, of 07. (Sounds of handwriting.) And I have 7:30 p.m. Just go and put "p.m." OK. Just so we're clear. |

---

[6]Three dot ellipses in the quotations of the interview indicate wordless pauses, not the editing out of words.

```
                        You want to go ahead and answer my questions
                        right now, correct?
        Warren:         You can ask them, yes.
        Det. Gomez:     OK.
        Warren:         Can I see the search warrant?
        Det. Gomez:     Someone is going to be bringing that.  I
                        don't have it with me.  One of the other
                        gentlemen has it at the house and will be
                        bringing it to you.  I don't think the other
                        detective has it.  If he does, he will bring
                        it in.  If not, one of the other guys will
                        bring it to you before we leave.
        Warren:         OK.
        Det. Gomez:     OK?
```

Id.

12.  After 3 minutes and 25 seconds into the interview, defendant Warren began answering the officer's questions without objection or comment about his right to counsel or right to remain silent.  At approximately 11 minutes into the interview, when asked about whether he downloaded software, including Limewire, into his computer, defendant stated three times, "I can't say."

```
        Det. Gomez:     What do you mean you can't say?
        Warren:         I'd rather not.
        Det. Gomez:     OK.
```

The questioning continued without objection or comment by Warren and Warren answered questions.

13.  At approximately 29 minutes into the interview, when encouraging Warren to be truthful, telling him that whatever is on the computer that had been seized will be found, the following occurred:

```
        Warren:         I do, too.  . . .  But I don't know much
                        about the law.
        Det. Gomez:     OK.
        Warren:         That is my concern.  And, you know.  You seem
                        like a nice guy.  But, I don't know.
```

| | |
|---|---|
| Det. Gomez: | OK.  You know . . . . Ask me a question, and . . . . |
| Warren: | No . . . I'm just saying I would kind of be more comfortable talking with a lawyer.  But I want to talk to you, but . . . . |
| Det. Gomez: | OK. |
| Warren: | Um.  I mean tomorrow or whatever. |
| Det. Gomez: | Tomorrow what? |
| Warren: | Discuss things . . . and  . . . with a . . . you know . . . . |
| Det. Gomez: | OK.  I . . . if you're asking for a lawyer, that's  . . . you know . . . that's fine.  I am not going to stop you, OK? |
| Warren: | OK. |
| Det. Gomez: | When you ask for a lawyer, we're done talking . . . that's fine . . . I'm not going to . . . it's your decision.  OK.  I'm not going to . . . |
| Warren: | OK, OK. |
| Det. Gomez: | I don't want to go any further if that's not what you're . . . a  . . . what you're asking for.  If you're saying, "I'm asking for one," that's your . . . |
| Warren: | Uh, no, no. |
| Det. Gomez: | You're not asking for one? |
| Warren: | No.  Not at this time. |
| Det. Gomez: | OK.  You're wanting to continue speaking with me, is that correct? |
| Warren: | That is correct. |
| Det. Gomez: | OK. |
| Warren: | I just . . . if there is a question, I . . . you know . . . . |
| Det. Gomez: | Well, like I told you at the very beginning, you . . . you  . . . you can stop when you want. |

| | |
|---|---|
| Warren: | All right. |
| Det. Gomez: | All right?  But there are certain questions I have to ask you and I know there are some certain questions that may make you uncomfortable. |
| Warren: | All right. |
| Det. Gomez: | OK?  And like I told you before, uh, that's natural.  OK.  And I don't care if it is easier if we were talking about Liz Vicious or whatever . . . you just met me.  I'm not going to go sit there and talk to some guy I just met at a bar or wherever about the porn girl that I like.  I understand that, OK?  The one thing that I told you is that I do this all the time.  So, I understand that it may make you uncomfortable, but I'm not going to, I don't want to press you into doing or saying anything you don't want to say or do. |
| Warren: | All right. |
| Det. Gomez: | But, if I ask you a question, uh, you know, if you want to answer it, answer it. |
| Warren: | OK. |
| Det. Gomez: | OK? |
| Warren: | And if I don't, at least . . . |
| Det. Gomez: | Let it be.  Have I not let it be? |
| Warren: | Oh no, no.  That's fine. |
| Det. Gomez: | OK.  So . . . . |

Id.  At that point, at about 31 minutes 36 seconds into the interview, the interview questions and answers continued.

14.  At approximately 8:37 p.m., after approximately one hour and eight minutes of the recorded interview Det. Gomez stopped the interview for a break.  The officer offered Warren an opportunity to use the bathroom and to drink some coffee and water.  Id.

15.  The interview resumed at 9:00 p.m. During the break defendant was able to use the restroom and drank some water.  First, Det. Gomez

reminded Warren that his constitutional rights still applied and Warren affirmed generally that he understood his rights. Thereafter, Det. Gomez continued asking Warren questions and Warren continued answering them and speaking with the officer. <u>Id.</u>

16. At approximately 9:35 p.m., Det. Gomez took a break in the interview which allowed Warren to use the restroom and to smoke a cigarette. <u>Id.</u>

17. At approximately 10:10 p.m., the interview continued. First, again Det. Gomez reminded Warren that his constitutional rights still applied and Warren affirmed generally that he understood his rights. Thereafter, Det. Gomez continued asking Warren questions and Warren continued answering them and speaking with the officer. During this portion of the interview, Det. Gomez played portions of several video clips taken from Warren's computer.

18. At approximately 6 minutes 43 seconds into this segment of the interview Det. Gomez paused the first video and asked Warren whether he recollected what the rest of the video depicted. To this question Warren said, "I'm not saying." Gomez then said, "But you do recall this video, correct," to which Warren answered, "Yes." Warren continued answering other questions without objection. When he had finished showing the video clips to Warren, at Gomez's request Warren handwrote his initials and the date on the video disk. At the end of the interview, Det. Gomez gave Warren a copy of the search warrant that had been previously executed. The interview ended at approximately 10:33 p.m.

19. The interview lasted approximately two hours. At no point during the interview did Det. Gomez yell at Warren or threaten him in any way.

**DISCUSSION**

Defendant has moved to suppress the physical evidence seized during the execution of the search warrant at 8923 Arvin and to suppress the statements he made during his police interview of September 12, 2007.

**1.  Issuance of the search warrant**

Defendant argues under Franks v. Delaware, 438 U.S. 154 (1978), that the affidavit of Det. McCartney contained false statements, or contained statements or failed to include information out of a reckless disregard for the truth.  "A search warrant is void and the fruits of the search must be suppressed if the defendant proves by a preponderance of the evidence that (1) the government knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit in support of the warrant, and (2) without the false statement, the affidavit does not establish probable cause."  United States v. Hansel, 524 F.3d 841, 845 (8th Cir. 2008)(citing Franks).  When considering the language of the affidavit in the application of Franks v. Delaware principles, the court must use a common sense approach, not a hypertechnical one.  United States v. Hudspeth, 525 F.3d 667, 674 (8th Cir. 2008).

Defendant argues that he made a showing sufficient to warrant a specific hearing under Franks.

> To prevail in her request for a Franks hearing, Engler must demonstrate that a law enforcement official either recklessly or deliberately included a false statement in the affidavits in support of the search warrants or omitted a truthful statement from the affidavits. United States v. Brown, 499 F.3d 817, 821 (8th Cir.2007), cert. denied, --- U.S. ----, 128 S.Ct. 1222, 170 L.Ed.2d 76 (2008). Further, Engler "must make a substantial preliminary showing of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the finding of probable cause." United States v. Gabrio, 295 F.3d 880, 883 (8th Cir.2002). Such a showing is not easily made. Id. Engler must show that if the allegedly unsupported content in the warrant affidavit is ignored, the remaining contents of the affidavit would not be enough to establish probable cause. Brown, 499 F.3d at 821.

United States v. Engler, 521 F.3d 965, 969 (8th Cir. 2008).

- 11 -

Defendant argues that the affidavit failed to include information, brought out during the suppression hearing, that the video file discerned by the investigator to be on the defendant's computer could in fact have been only partly on the defendant's computer while other components of it came from other sources.  He argues that the officers testified that they could not determine whether defendant's computer was responsible for any portion of the video file the officers believed was on his computer.

### a. Affidavit statement that video file was downloaded, at least in part, from defendant's computer

More specifically, defendant refers the court to affidavit paragraphs 5, 15 and 17.

Paragraph 5 stated:

Sgt. Kavanaugh's investigation revealed that a computer using the IP address of 70 . . . 167, which was determined to belong to the Internet Service Provider "AT&T Internet Services" was being used in St. Louis, Missouri and *was contributing to* the distribution of child pornography.  This affiant knows from experience that the software can be configured to allow parts of the file to be shared even if the copy located at IP address of 70 . . . 167 *has not yet been completely downloaded*.

Gov. Ex. 1 at 4 (italics added).

Paragraph 15 stated, "At approximately 1458 hours on July 16th, 2007 Sgt Kavanaugh *was able to download* in part, the file with a SHA1 value of H4V . . . UTI from a computer using the IP address of 70 . . . 167." Id. at 6 (italics added).

And paragraph 17 stated:

Affiant can conclude from training and experience that the search results indicated that a computer located at IP address of 70 . . . 167 *was contributing to* the distribution of child pornography for the above stated reasons.  Affiant knows from training and experience that the software can be configured to allow parts of the file to be shared even if the copy located at IP address of 70 . . . 167 *has not yet been completely downloaded*.

Id. at 6 (italics added).

Defendant argues that Det. McCartney's affidavit at first implied (in paragraph 5:  "even if the copy located at IP address of 70 . . . 167

has not yet been completely downloaded", and in paragraph 17: "even if the copy located at IP address of 70 . . . 167 has not yet been completely downloaded") and then affirmatively stated (in paragraph 15: "Sgt. Kavanaugh was able to download in part, the file with a SHA1 value of H4V . . . UTI from a computer using the IP address of 70 . . . 167") that at least part of the subject video file was actually downloaded by the officer from defendant's computer. If this was the intended meaning of the affidavit, it was not a correct statement. At the suppression hearing the officers testified that they could not tell where the portions of the subject video file were coming from that the police computer was downloading, whether from defendant's computer or from some other computer participating in the offers to provide the officer's computer with the subject video file.

The government argues that the language of paragraph 15, "was able to" indicates a *potential* ability to download the subject file, not that the officers had *actually* downloaded part of the file. The undersigned agrees that in common parlance this language indicates the investigating officer had the means to download at least a part of the subject file from defendant's computer, not that the officer *actually* downloaded the file from defendant's computer. <u>See</u> <u>American Heritage Dictionary of the English Language</u>, at 3 (1969 ed.)("having sufficient ability or resources").

Defendant argues that the language "has not yet been completely downloaded," also indicates that the affiant was stating that the investigating officer had actually downloaded at least part of the subject file. The undersigned believes this argument is without merit. The grammar and context of the sentences in which this language is found, in paragraphs 5 and 15, indicate that it is the defendant's computer that is being described as offering to share to others on the Internet the parts of the file it has downloaded even before *it* has completely downloaded all of the parts of the file.

Given the context of the full affidavit, in which the identity of SHA1 values indicates identity of digital files, described below, the undersigned concludes that a reasonable interpretation of the affidavit by the issuing judge was not that the officer had in fact downloaded at

least part of the subject file from defendant's computer onto the police computer but that the officer had the ability to do so.

Nevertheless, in the complete assaying of whether the officer's affidavit provided the issuing a judge a substantial basis for finding probable cause, the undersigned concludes that in this the defendant is correct: the affidavit ought not be read to say that the officer actually downloaded from the subject computer at least a part of the subject video file.

### b. Affidavit statement that defendant's computer was contributing to the distribution of child pornography

Defendant argues that the statements in the affidavit, to the effect that his computer was contributing to the distribution of child pornography, were false or at least made with a reckless disregard for the truth. This is because, defendant argues,

> the officer and the affiant could not definitively state during their courtroom testimony [during the suppression hearing] that the video in question was downloaded directly from Defendant or if it was from one of the many other 'hosts' that potentially had this file to share. (Tr. p. 19, l. 13-21, pp. 37-38, l. 20-37, 1-8 & p. 56, l. 21-23). In fact, the officers could not even state that any actual illegal child pornography came from the IP address belonging to the Defendant. *Id.* Therefore, it is a false statement and misleading statement to claim that this IP address *was* in any way contributing to the distribution of child pornography. *See*, Tr. p. 21, l. 11-14 (Det. McCartney admits that there may [be] no illegal images that can be attributed to the Defendant's IP address).

Doc. 31 at 3.

This argument is without merit. The affidavit clearly indicates that, as a matter of fact and from his training and experience, the investigating officer observed from his available-to-all Internet position that the subject computer was configured in a way that allowed outsiders to access its shared file folder which the officer was able to discern contained a copy of the digital video file with the SHA1 value which the officer knew and stated in the affidavit identified the file as a complete copy of the file which contained child pornography. (Tr. 35, 47.)

- 14 -

<u>c.  Statement that officer viewed the "noted file"</u>

Defendant also argues that the statement at paragraph 23 of the affidavit, that Det. McCartney stated he viewed the "noted file", is false and misleading if intended to mean that "noted file" refers to one actually downloaded on July 16, 2007, during the investigation. Defendant points out that during the suppression hearing Det. McCartney testified that he viewed a file with the subject SHA1 value, not a file that was downloaded during the investigation.  (Tr. p. 20, lines 15-25.) Defendant also points out that the affidavit does not state that any officer actually viewed the file that was actually downloaded by Sgt. Kavanaugh during the investigation.

This argument is without merit.  Det. McCartney testified at the hearing in effect that the most he could say was that a file with the subject SHA1 value was viewed, not necessarily one downloaded on July 16, 2007, even in part from defendant's computer.  As set forth above, the affidavit's  specific reference to a video file, next prior to paragraph 23, is found in paragraph 15 which recounts the officer's potential ability to download the subject file from the subject computer on July 16, 2007, not that the officer had downloaded the file from defendant's computer.

<u>d.  Failure to include information in affidavit</u>
(i)  "PTHC" as a search term

Defendant argues that the affidavit did not inform the issuing judge what the file name assigned by defendant to the file was on his computer and it did not tell the judge that the use of "PTHC" as a search term could result in innocent and legal files on the Internet, which defendant argues Det. McCartney admitted during his suppression hearing testimony. (Tr. p. 16, lines 6-10.)  At that part of the hearing the officer testified that files with the same SHA1 value could have been given different names on the computer(s) in which they were saved without affecting the SHA1 values.

Defendant's argument, even if reflected in the hearing testimony, is nonetheless without merit.  The affidavit at paragraph 3 stated that the officer's use of this search term resulted in a list of files being

identified, one of which had the SHA1 value H4V . . . UTI.  The affidavit did not state that all of the files on the responsive list were pornographic.  The affidavit's recounting of the use of "PTHC" as a search term merely described the initial step in the officer's investigation.

### (ii)  The "swarm"

Defendant argues that the affidavit misled the issuing judge because it failed to state that the subject file was downloaded in a "swarm" procedure, where the discrete packets of digital data that comprised the subject file came to the police computer during the investigation from a potentially large number of computers on the Internet, one of which *might or might not* have been the defendant's.  This fact was testified to by Det. McCartney.  (Tr. p. 21, lines 11-14; p. 37, lines 2-5; and p. 58, lines 5-10.)  This misled the issuing judge, defendant argues, because the affidavit indicated that the officers verified that the pornographic images they downloaded in the investigation came from defendant's IP address.

The argument is without merit.  The affidavit sufficiently advised the issuing judge that a substantial number of computers on the Internet, including defendant's, which had the video file with the subject SHA1 value, were offering to provide it to the officer's computer.  See Aff. ¶ 4 ("a list of IP addresses", 13 ("lists of IP addresses"), and especially ¶ 8g (which described the Gnutella network and software at length).

### (iii)  Live browse

Defendant argues that the affidavit failed to tell the issuing judge that the investigating officer could have but did not perform a "live browse" of defendant's computer via the Internet and the publicly available software, to actually view the subject file on defendant's computer.  Defendant's computer had been programed to allow outside computers from the Internet to have access to its "shared file folder" for the purpose of participating in file sharing.  Defendant argues that

this would have allowed the officer to confirm that the illicit video file was in fact on defendant's computer.

This argument is without merit.  Generally, a search warrant affidavit is not to be judged as to what the investigator could have done during the investigation, and included in the affidavit, but did not. Cf. United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002)(police need not include in affidavit bargaining between police and informants).  The affidavit is to be judged from the information contained within its four corners.  United States v. Hudspeth, 525 F.3d 667, 674 (8th Cir. 2008).

(iv)  Whether defendant was a collector or distributor or not

Defendant argues that the affidavit failed to tell the issuing judge that the officers had no information about whether defendant was a collector or distributor of child pornography, even though paragraphs 21 and 22 imply that he is.  This argument relates to whether the probable cause information set forth in the affidavit, that child pornography was on the subject computer on July 16, 2007, was likely still true when the search warrant was issued on September 11, 2007, almost two months later.

This argument is without merit.  The affidavit informed the issuing judge that Det. McCartney, from his training and experience, knew that files downloaded from the Internet leave evidentiary files, logs, or file remnants in the computers (paragraph 20).  This information alone was sufficient to indicate that the computer likely contained evidence of the subject file at the later date.

The affidavit further stated that persons who "collect" child pornography tend to keep it on the computer for extended periods of time and do not delete the images and "[t]he tend to use them as bargaining tools when trading with others" (paragraph 21).  The affidavit indicated that defendant's computer offered the subject file with the subject SHA1 value to others via the Internet, which reasonably indicated to the issuing judge that the subject computer had previously received the subject video file and was now offering it to others on the Internet, including Sgt. Kavanaugh's computer.  A person making such use of the video file can reasonably be considered to be a "collector."

(v)  Identity of files due to SHA1 values

Defendant argues that the affidavit misled the issuing judge into thinking that every computer that possessed a file with the subject SHA1 value possessed the entirety of the file, which included the child pornographic images.  Indeed, affidavit paragraphs 9 (Sgt. Kavanaugh's statement), 13 (Det. McCartney's statement), and 14 (statements of both Det. McCartney and Sgt. Kavanaugh) indicate an identity principle:  the same SHA1 values indicate the presence on a computer of a complete copy of the same video file, which would include the child pornography. Defendant argues that Det. McCartney, the affiant, testified at the suppression hearing[7] that a computer might be able to hold only a part of the subject video file (with or without child pornographic images) but that partial video file would still have the subject SHA1 value.

At the hearing, Sgt. Kavanaugh testified that if a computer began downloading from an originating computer a video file that, at its originating computer carried a specific SHA1 value, but the downloading computer stopped downloading and save only a portion (small or large) of the file, in the downloading computer the file would have its SHA1 value automatically changed to a different SHA1 value to reflect the new characteristics of the downloaded file (e.g. that it is different in size than the original file).

With respect to the subject file and defendant's computer, on the day of the investigation, when Sgt. Kavanaugh observed that defendant's computer offered the subject video file for Internet sharing from its "shared file folder", the file in the subject computer's shared file folder with the subject SHA1 value was the entirety of the video file previously known by the officer to contain images of child pornography and to carry the same SHA1 value.  He testified at the hearing that, if in the downloading of the subject file from an outside computer, defendant's computer stopped downloading before the entire file was downloaded and saved the partial download to the shared file folder, the file would acquire a very different SHA1 value.  (Tr. 46-53.)

---

[7]See transcript p. 17, lines 9-15; p. 34, lines 1-12; and p. 41, lines 11-14.

- 18 -

Defendant argues that Sgt. Kavanaugh's hearing testimony is irrelevant, because he was not the affiant. Rather, he argues that Det. McCartney's failure to state in the affidavit what he testified to in the hearing misled the issuing judge. This argument is without merit. The affidavit contained statements from both officers that were consistent with Sgt. Kavanaugh's testimony that video files were identical if they had identical SHA1 values. The undersigned credits Sgt. Kavanaugh's testimony about the identity principle.[8]

Defendant's argument in this regard is without merit.

### e.  Substantial basis shown for finding of probable cause

Defendant argues that he is entitled to a further hearing under Franks v. Delaware. The undersigned disagrees. This is because, even if the portions of the affidavit, argued as false or recklessly included in the affidavit, were removed, substantial information remained in the affidavit which provided the issuing judge with a substantial basis for finding probable cause, which is the standard that guides this reviewing court. United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994); United States v. Peterson, 867 F.2d 1110, 1113 (8th Cir. 1989); United States v. Martin, 866 F.2d 972, 976 (8th Cir. 1989) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit. United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. at 238).

In the case at bar, the affidavit in paragraphs 2, 4, and 5 informed the issuing judge that Sgt. Kavanaugh located a computer with an IP address of 70 . . . 167 that was offering to share with the officer's computer on the Internet at least in part a video file with the SHA1

---

[8]The identity of digital video files with the same SHA1 values is accepted by the digital industry. See e.g., Kruse and Heiser, Computer Forensics: Incident Response Essentials, at 89-90 (Addison Wesley 2002) (although developed to determine whether data files have been modified, although subject to some hacking, hash algorithms like the SHA1 algorithm indicate to a very extremely high degree of accuracy whether digital files have changed or are the same).

value of H4V . . .UTI, which he knew contained images of child pornography and which, from the officer's training and experience, he knew was contained in its entirety on the subject computer.  It was the computer's offering to share the video file with child pornography which informed paragraph 6's statement that the subject computer was "contributing to the distribution of child pornography."  The subject computer in effect told interested parties on the Internet that it had available for downloading the video file with the SHA1 value of H4V . . . UTI.  By responding affirmatively to the request for a file with that SHA1 value, the subject computer was in effect stating that it had the entirety of the file, as the search warrant affidavit explained expressly in paragraphs 5, 9, and 14.  This was sufficient information to persuade a reasonable person that child pornographic images would be found on the subject computer.

### Good faith exception under United States v. Leon

The government argues that, if the court concludes that the search warrant was improperly issued, the court should find that the officers nevertheless relied in good faith on the search warrant and, thus the seized evidence should not be suppressed.  Defendant argues that the court should not apply the good faith standard.

The Eighth Circuit stated the good faith issues thus:

> While evidence obtained as a result of a defective search warrant is generally inadmissible, there is an exception for evidence found by officers relying in objective good faith on a defective search warrant. United States v. Leon, 468 U.S. 897, 920-21 (1984) (establishing the good faith exception). However, four circumstances exist in which the *Leon* good faith exception does not apply:

>> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made in reckless disregard for the truth; (2) the issuing magistrate judge wholly abandoned his [or her] judicial role; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient ... that the executing officers cannot reasonably presume it to be valid.

* * *

When we assess the objective reasonableness of the officers who executed a warrant, we must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge.

United States v. Guzman, 507 F.3d 681, 684 (8th Cir. 2007)(internal citations omitted).  In the exercise of the Leon standard, the court does not invalidate the seizure of evidence pursuant to a search warrant that was reasonably relied upon by the executing officer as having been issued in compliance with the Fourth Amendment.  United States v. Leon, 468 U.S. 897, 920-24 (1984).

Defendant argues that the Leon standard should not be applied in this case, because of the first exception stated above, that the affidavit contained either false statements or statements made in reckless disregard for their truth or falsity.  The undersigned believes that the first exception is without merit, as set forth above.  Therefore, the Leon standard would be applicable, if the court were to find, which the undersigned does not, that the search warrant violated the Fourth Amendment.

In consequence, defendant's motion to suppress the evidence seized pursuant to the search warrant should be denied.

## 2.  Voluntariness of defendant's post-arrest statement

Warren argues that the oral statements he made on September 12, 2007, were involuntary because he made them without a lawyer present and because he was coerced during the interrogation.  (Doc. 21.)

The Fifth Amendment to the Constitution protects an individual from being "compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  The Fourteenth Amendment to the Constitution guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV.  These two constitutional principles require that a confession must be voluntary to be admitted into evidence.  Dickerson v. United States, 530 U.S. 428, 433 (2000).

A statement is involuntary when it is induced by the interrogating officer by threats, violence, or express or implied promises sufficient to overcome the defendant's will and critically impair his capacity for self-determination. United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). Whether a confession is involuntary is judged by the totality of the circumstances, but with a focus on the conduct of the officers and the characteristics of the accused. Id. Indeed, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ." Colorado v. Connelly, 479 U.S. 157, 167 (1986). The government bears the burden of proving the challenged statements were voluntary by a preponderance of the evidence. LeBrun, 363 F.3d at 724.

In this case, Det. Gomez asked Warren if he would accompany him to the St. Louis County Police Department for an interview. Warren agreed to do so. Det. Gomez did not threaten or make any promises to induce Warren's cooperation. In addition, Warren did not appear to have any mental or physical condition that would have made an interview inappropriate. At the beginning of the interview, Det. Gomez read Warren his Miranda rights. Warren indicated he understood each of his Miranda rights. See Dickerson, 530 U.S. at 444 ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.").

The interview started around 7:30 p.m., and was tape-recorded. At 8:37 p.m., Det. Gomez stopped the interview for a break, and offered Warren the chance to use the bathroom and to drink some coffee and water. At 9:00 p.m., the interview resumed. At 9:35 p.m., Det. Gomez took another break, and Warren used the bathroom and smoked a cigarette. The interview resumed at 10:10 p.m., before ending at 10:33 p.m. After each break Det. Gomez reminded Warren that his constitutional rights still applied and Warren generally affirmed that he understood his rights. Det. Gomez did not threaten or yell at Warren at any point during the interview.

Looking to the totality of the circumstances, it is clear that Warrens's statements were voluntary. During the interview, Det. Gomez

took two breaks, and offered Warren the chance to use the bathroom, drink coffee, and smoke cigarettes.  Det. Gomez read Warren his <u>Miranda</u> rights at the beginning of the interview, and reminded him of his rights after each break.  Det. Gomez never threatened or coerced Warren.  He never made any promises to Warren.  Finally, Warren's responses to the questions were clear and coherent.  He did not appear to be in a condition that would have made the interview inappropriate.  Considering all of the circumstances, Warren's statements were voluntary.  <u>See</u> <u>United States v. Moser</u>, 235 F. App'x 138, 142-43 (4th Cir. 2007) (per curiam) (unpublished), <u>cert. denied</u>, 128 S. Ct. 822 (2007) (finding statements voluntary where defendant was allowed numerous restroom breaks during interview, was encouraged to eat and drink, had been advised of his <u>Miranda</u> rights, was not too tired to continue with questioning, and the interview was not excessively long).

### 3.  Request for Counsel

Defendant moves to suppress his statements, because he invoked his constitutional right to counsel during the interview with police.

The Fifth Amendment to the Constitution protects an individual from being "compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned, before being interrogated, that he has the right to remain silent, the right to consult with an attorney, and the right to have an attorney present during the questioning.  <u>Davis v. United States</u>, 512 U.S. 452, 457 (1994); <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1996).  The police must explain these rights to the suspect before questioning him.  <u>Davis</u>, 512 U.S. at 457.  If the suspect effectively waives his right to counsel after the police explain the <u>Miranda</u> rights, then law enforcement officers are free to question the suspect.  <u>Id.</u>  Once questioning begins, the suspect may still invoke his right to counsel.  <u>See</u> <u>id.</u>  And once the suspect requests a lawyer, the police must stop their questioning until an attorney is actually present, or until the suspect reinitiates the conversation.  <u>Id.</u>

To invoke the right to counsel and end questioning, the suspect must unambiguously request a lawyer. <u>Id.</u> at 459. "[H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." <u>Id.</u> An ambiguous or equivocal reference to an attorney will not be sufficient to require the cessation of police questioning. <u>Id.</u> In addition, the officers have no obligation to ask the suspect to clarify an ambiguous statement. <u>Id.</u> at 461-62. "Unless the suspect actually requests an attorney, questioning may continue." <u>Id.</u> at 462 (finding the statement "maybe I should talk to a lawyer" was not a request for counsel).

Warren points to his statements "I would kind of be more comfortable talking with a lawyer," and "Um. I mean tomorrow or whatever," as indicating he wanted an attorney immediately, and wanted to wait until the next day to continue his interview with Det. Gomez.[9] (Doc. 31.) The full record of the interrogation does not support this argument. After Warren expressed these statements, Det. Gomez asked Warren if he was requesting a lawyer. Warren responded that he was not asking for a lawyer: "No. Not at this time." To confirm this, Det. Gomez immediately asked Warren if he wanted to continue speaking with him. Warren responded, "[t]hat is correct."[10] Under the circumstances, Warren's statements "lacked the clear implication of a <u>present desire</u> to consult with counsel . . . ." <u>Lord v. Duckworth</u>, 29 F.3d 1216, 1221 (7th Cir. 1994) (emphasis added).

The need to safeguard a suspect's constitutional rights must be balanced against the need for effective law enforcement. <u>Davis</u>, 512 U.S. at 461. The Supreme Court has struck this balance by requiring a suspect to unambiguously and unequivocally request counsel. <u>Id.</u> at 459. Nothing less will suffice. <u>See</u> <u>id.</u> Under the circumstances, Warren did not unambiguously and unequivocally request a lawyer. <u>See</u> <u>Dormier v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001) ("Could I call my lawyer?" was not a clear and unambiguous request for counsel); <u>see also</u> <u>Diaz v.</u>

_____

[9]<u>See</u> Finding of Fact 13, above.

[10]<u>Id.</u>

<u>Senkowski</u>, 76 F.3d 61, 63-66 (2d Cir. 1996) (finding statements "I think I want a lawyer" and "Do you think I need a lawyer" were not a clear and unambiguous request for counsel). Warren's statements during this interview may be used against him.

The motion to suppress his interview statements should be denied.

## **RECOMMENDATION**

For the reasons set forth above,

**IT IS HEREBY RECOMMENDED** that the motion of defendant to suppress physical evidence and his statements (Docs. 11, 20, 21) should be denied.

The parties are advised they have ten days in which to file written objections to this Report and Recommendations. The failure to file timely written objections will waive the right to appeal issues of fact.

## **ORDER SETTING TRIAL DATE**

At the direction of the District Judge,

**IT IS FURTHER ORDERED** that this action is set for a trial by jury on October 6, 2008, at 9:00 a.m.


    /S/    David D. Noce
UNITED STATES MAGISTRATE JUDGE


Signed on July 24, 2008.